UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

POWERHOUSE BEVERAGE COMPANY LLC, et al.,

                Plaintiffs,

-against-

FRANK NAHOUM, et al.,

                Defendants.

22-cv-5559 (AS)

OPINION AND ORDER

ARUN SUBRAMANIAN, United States District Judge.

## BACKGROUND

    This case (and its many state-court siblings) has a tortured history. This recap covers only the last several months. On August 9, 2023, this case was reassigned to this Court. After requesting a joint letter updating the Court on the status of this case, Defendants submitted a "joint" letter signed by only them. Dkt. 86. After the Court pointed out that problem, each side filed dueling "joint" letters. Dkts. 87–89.

    At that time, Defendants had a pending motion to declare Daniel Ehrlich a vexatious litigant. (Though a nonparty, Ehrlich controls Plaintiff Powerhouse Beverage LLC and is the central figure in this case.) Under the All Writs Act, 28 U.S.C. § 1651. Defendants sought to enjoin all the related state proceedings—even though they originally brought those suits.

    On August 31, 2023, the Court held a hearing on the motion. There, the Court learned that this case turns on who has the valid version of a contract. By "valid," the Court does not mean the usual stuff of contract cases: meeting of the minds, fraudulent inducement, and the like. Instead, each side accuses the other of old-fashioned forgery.

    Stepping back for a moment, this case is a battle for control of Powerhouse Beverage. It is an LLC, and all Defendants but one were members. (The one exception is their lawyer, who has been named as a defendant for allegedly perpetrating a fraud by representing them.) Ehrlich was also a member and Powerhouse's manager. The member-Defendants allege that, in the summer of 2014, they learned that Ehrlich was embezzling. When they threatened to oust him, he replied that they didn't have the votes.

    At that time, the LLC was governed by the operating agreement dated January 28, 2014. That is the disputed contract. The parties agree that § 5.3 of the contract governs how many votes are needed to oust a manager. *See* PX-8 at 9 § 4.4 ("The Members by the required vote as set forth in Section 5.3 shall be entitled to remove any Manager …."); DX-3 at 9 (same). Plaintiffs' version says a "super majority" vote is required. PX-8 at 10–11. Defendants' version of § 5.3 requires just a "majority." DX-3 at 10–11. This difference mattered because Ehrlich held about half the votes.

One other piece of context: although the parties dispute the § 5.3 voting requirement, both versions of the agreement require a "supermajority" in § 4.5, which covers "Approval or Ratification of Acts or Contracts by the Managers." *Id.* at 9–10; PX-8 at 9–10.

Back to the hearing. After repeatedly reminding the parties of the seriousness and penalties of perjury, both sides stood firm. And both agreed that this super/majority issue was central to this and the state cases. So the Court suggested a trial on this "one … separate issue[]" to "expedite and economize" the litigation. Fed. R. Civ. P. 42(b). The parties agreed, and they waived their jury-trial rights. Dkt. 90. They also decided that they would not engage in any discovery (and no discovery had yet been conducted, despite this case's eighteen-month pendency). Instead, they chose to rely on what had been produced in state-court discovery.

In the lead-up to this trial, the Court ordered the parties to submit their respective versions of the agreement. *Id.* With those submissions, counsel for each side signed letters certifying "that to the best of [his] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," the version of the agreement he was submitting was true and correct. *Id.* (quoting Fed. R. Civ. P. 11).

The parties also submitted a small number of documentary exhibits. Each side produced its purported version of the agreement (again), a handful of emails, and some other evidence. The Court was surprised by how few emails and other documents were produced; the parties seemed to almost always conduct their business in person. *See, e.g.*, Trial Tr. 188:6–20, 265:6–266:3.

The Court then held a two-day bench trial. Plaintiffs presented one witness (Ehrlich) and Defendants presented four (each of the four member-Defendants). Each witness's direct testimony was provided by affidavit, and all five were cross-examined. (The only other party to the operating agreement, Reynolds & Company Venture Partners LLC, did not appear, despite the Court's urging the parties to procure its owners' appearances.) In the end, including the five affidavits, the Court formally admitted about a dozen pieces of evidence.

On this thin record, credibility was important. The Court paid close attention to the witnesses' demeanors as well as the logic and consistency of their accounts. But the relevant events took place nearly ten years ago, making every account faulty. Yet testimony was not the only measure of credibility. Though there were relatively few documents from which to draw substantive conclusions, the form in which the documents were produced was revealing.

Given the unusual nature of this trial, the Court need not make any conclusions of law; the single issue is a question of fact. *Cf.* Fed. R. Civ. P. 52(a).

## REVIEW OF EVIDENCE AND FINDING OF FACT

Based on its review of all the evidence, including but not limited to the discussion below, the Court finds by a preponderance of the evidence that Defendants' version of the agreement is genuine. *See* DX-3; DX-6; DX-7. The Court finds that Plaintiffs' version is not genuine. *See* PX-8.

### A. Witness testimony and the signature pages

The Court did not find the witness testimony especially helpful. Each witness was also a party, and each testified according to his self-interest. None of the witnesses' accounts was entirely consistent or credible. Plus, as noted, the relevant events occurred in early 2014, making recollections generally unreliable or at least incomplete.

For instance, no witness could explain the signature pages. Defendants produced three copies of their version of the agreement (from three different members) and Plaintiffs produced one. Each signature page has the signature of every member, and no two signature pages are identical. No witness could explain why that was so. Given that all the signatures were on one page, one would think that page would be attached to the original agreement and the rest would be copies. But the pages weren't identical. Or maybe each member signed each other member's copy at a board meeting. But that ring-around-the-rosy approach would be odd, and no witness said that happened. Both the witnesses and the lawyers were stumped. *See* Trial Tr. 87:15–89:21, 258:3–259:14, 273:4–9, 274:20–22. So the Court did not find the signature pages especially probative.

### B. Emails between Ehrlich and Reynolds from January 25, 2014

The most probative evidence in this case was produced on (literally) the eve of the final day of trial. Before trial, Defendants produced an exhibit with two emails between Ehrlich and Andrew Reynolds, one of the owners of Reynolds & Company. *See* DX-2. Why *Defendants* produced this exhibit remains a mystery. On its face, it seems to support Plaintiffs' position. It says that "all major decisions," perhaps including § 5.3, should be by supermajority. In any event, Defendants received it from Ehrlich in state-court discovery and submitted it here in the same form. Trial Tr. 44:23–45:11, 51:11–24, 82:13–83:9. Here it is:

> From: dan iqjuice.com <dan@iqjuice.com>
> Sent: Saturday, January 25, 2014 1:53 PM
> To: Areynolds@rcvpartners.com <Areynolds@rcvpartners.com>
> Subject: RE: Re: Powerhouse & RCVP term sheet
>
> Andrew,
>
> I thought all major decisions should be by Supermajority. I am just trying to think ahead, and make more of a threshold for major decisions for the Company.
>
> Let me know your thoughts.
>
> Dan
>
> Dan Ehrlich
> Co-Founder/Chairman
> Powerhouse Beverage Company, LLC
> 1557 Lexington Avenue
> New York, NY 10029
> 646 761-1190
> dan@iqjuice.com
>
> From: "Areynolds@rcvpartners.com" <Areynolds@rcvpartners.com>
> Date: 1/25/14 2:44 pm
> To: "dan@iqjuice.com" <dan@iqjuice.com>
>
> I think that makes sense. Good for Bernie and I.

For anyone who has seen an email exchange reproduced, this exhibit reeks. To start, the reply is *below* the original message. Though that ordering reflects how we naturally read, it is not how email programs typically output messages. Plus, the fonts and formatting of the to/from blocks don't match. Clearly, the emails were not being presented in their original form. Whether this presentation problem also reflected misleading content was unclear.

When the Court asked Ehrlich about this odd presentation directly, he didn't have a clear answer. Trial Tr. 99:22–101:12. He seemed to suggest that it was simply how his email program reproduced email threads. *Id.* The Court then ordered Plaintiffs to produce the whole exchange in its original form. Plaintiffs' counsel forwarded the full exchange at 10:34 p.m. on Halloween, the night before the last day of trial. Neither side objected to admitting the full email thread. Trial Tr. 203:8–12.

Here is that snippet again—this time with context:



4

It's a bit hard to read, so the relevant pieces are reproduced (in chronological order) below:

> Ehrlich: Here are the wire instructions …. Also, let's add language to Section 4.5 … any act or contract … shall be approved by the holders of a "supermajority, two-thirds majority". This will be to both our benefits.
>
> Reynolds: Can [I ask] why the change and what is the benefit to the co?
>
> Ehrlich: I thought all major decisions should be by Supermajority. I am just trying to think ahead, and make more of a threshold for major decisions for the Company. Let me know your thoughts.
>
> Reynolds: I think that makes sense. Good for Bernie and I.

This exchange shows that the original excerpt was taken out of context. There is no mention of adding a supermajority requirement to § 5.3, despite Ehrlich's testimony to the contrary. *See* Trial Tr. 82:22–83:9. And not only does the exchange undermine Plaintiffs' position, but it also supports Defendants'. It shows that changing § 4.5 to include "supermajority" was specifically contemplated in advance and in writing. One would expect a change to § 5.3 to have a similar paper trail.

With the complete email string in the record, Plaintiffs tried to argue that "all major decisions" included § 5.3 too. Trial Tr. 253:12–20. That argument is frivolous. Ehrlich's second email is responding to Reynolds's question about Ehrlich's prior email, which mentioned only § 4.5; Ehrlich is plainly clarifying.

Practically, changing only § 4.5 also makes more sense for Reynolds & Company. As a major new investor, it would likely want to be protected *from* the manager. Changing § 4.5 to require a supermajority gives Reynolds greater control over contracting. *See* Trial Tr. 184:20–185:7. Changing § 5.3 would have the opposite effect, protecting the manager. It would insulate the manager from removal, potentially empowering the manager to entrench himself and causing the business to grind to a halt.

These emails also shed light on the handwritten marks on Defendants' agreements. In Defendants' versions, § 4.5 says "supermajority," § 10.2 is crossed out by hand and initialed by Ehrlich, and § 5.3 says "majority." That combination makes sense if the change to § 4.5 was made in advance, the change to § 10.2 was made at the last minute, and no change was ever made to § 5.3. Ehrlich's email suggests at least the first part, and credible testimony supports the second. *Compare* Trial Tr. 95:2–98:3, *with* 185:8–189:4; *see also* Trial Tr. 96:2–3.

Perhaps § 5.3 was changed at some later time. As Ehrlich said, making changes "was a process." Trial Tr. 51:24. But he also testified that the changes to §§ 4.5 and 5.3 were agreed to within a day of each other—and both before the January 28 signing day. Trial Tr. 82:22–83:9. Ehrlich also said that the change to § 10.2 was agreed to before January 28. Trial Tr. 96:2–3. But he cannot reconcile that account with Defendants' versions that already include the change to § 4.5, have the § 10.2 change marked by hand, and do not include the § 5.3 change at all. (Plus, Ehrlich testified

5

that he and Reynolds agreed to the §§ 5.3 and 10.2 changes over email but never produced any such emails. Trial Tr. 82:22–83:9, 96:2–3.)

Ehrlich responds by insisting that Defendants' copies of the agreement were just "drafts." *See, e.g.*, Trial Tr. 95:5–98:3. But that explanation doesn't withstand scrutiny, either. Ehrlich testified that he used the August 2013 operating agreement as the "draft" and then marked the changes. Trial Tr. 11:15–12:4. But that can't be right because even Defendants' "drafts" already reflected the change to § 4.5, which was not in the August agreement. Trial Tr. 34:20–23; DX-1 at 15. Plus, Ehrlich said he and each other member marked up the drafts together. Trial Tr. 11:16–18; 12:3–5; 19:20–20:7, 36:20–37:17, 46:4–15, 74:5–10, 86:5–87:6, 97:7–98:3. But if that is true, it is especially odd that (1) only Ehrlich's initials appear next to the hand-marked changes to § 10.2 and (2) there are no changes to § 5.3. *See* DX-3 at 10–11, 15; DX-6 at 10–11, 15; DX-7 at 10–11, 15.

Finally, these emails and the handwritten marks reflect something broader: when there was a change to the agreement, there was at least *some* paper trail. *See also* DX-1 (emails circulating the August 2013 agreement). But all Ehrlich has for his claimed change to § 5.3 is his say-so.

### C. Meeting minutes from February 7, 2014

Facing a shortage of contemporaneous validation, Plaintiffs lean on the purported meeting minutes from February 7, 2014. *See* PX-10. This exhibit is simply a typed list of items supposedly discussed at that board meeting. Toward the end of the one-and-a-half page document, it says "Resolution: From the Powerhouse Beverage Company, LLC Operating Agreement dated January, [*sic*] 28, 2014 section 5.3 that all decisions of the LLC will be by Super Majority, 2/3 member voting units. All members representing a Quorum all say ay." PX-10 at 2.

But these minutes lack any indicia of genuineness. They were never signed, circulated, or otherwise approved as accurate. *See* Trial Tr. 89:22–90:23, 190:2–10. This document supposedly sat on Ehrlich's computer for years, only to emerge to support his position in this litigation.

Yet the minutes are informative based on what they lack. During his cross-examination, Ehrlich was pressed as to why the members would need to vote to ratify the change to § 5.3 if they had already signed the agreement. His response was that, because Powerhouse was an LLC, all changes had to be approved by resolution. Trial Tr. 12:23–13:9, 16:4–8, 21:15–21. That answer is dubious as a matter of both New York LLC law and this LLC's operating agreement. *See* N.Y. Ltd. Liab. Co. Law § 417(b) ("The operating agreement of a limited liability company may be amended from time to time as provided therein …."); DX-6 at 21 § 14.3 ("[A]ny amendment shall require the written consent of Members holding a Unit Percentage of at least 65% .…").

Interpreting Ehrlich's statement charitably, though, one could imagine that the board took a belt-and-suspenders approach, signing the agreement and voting on its changes. But if that was the board's approach, why do the minutes refer to only § 5.3's change? The members should have also voted on changing § 4.5, deleting § 10.2, and adding Reynolds & Company as a member. Instead, the only change expressly "ratified" at the meeting is the one that Ehrlich needs to win these lawsuits. That is too convenient.

### D. Emails from August 2014

Plaintiffs point to two other email exchanges to show that § 5.3 was always understood to require a supermajority. First, in an email from August 1, 2014, Ehrlich responds to a letter from Defendants' lawyer, saying, "As an LLC we have an Operating Agreement dated January 28, 2014 and in section 5.3 states [*sic*] all decisions of the LLC are by super majority of 66% voting units." PX-12 at 3. Like the emails discussed above, this exhibit also fails to include the whole email thread. In any event, the email isn't useful—it doesn't reflect a contemporaneous understanding. It was sent six months after the agreement was signed and after the control dispute had arisen.

Second, one Defendant's emails from August 2014 also mention a "super majority." PX-27. When questioned about it, the Defendant testified that "super majority" was "just a metaphor like majority on steroids." Trial Tr. 119:13–14. The Court didn't find that answer credible. But this email isn't a slam dunk for Plaintiffs, either. Everyone agrees that § 4.5 required a supermajority. And these emails discuss new investors and buyouts, which might fall under that section. And by the time of these emails, Ehrlich had said that the other members needed a supermajority to remove him. Even if the other members didn't think that assertion was true, they might have found it easier to gather a supermajority rather than to try to enforce the true agreement in court. In any event, these emails say nothing about whether § 5.3 had a supermajority requirement.

### E. Plaintiffs' other copies of the agreement

Finally, on the last day of trial, Plaintiffs introduced what they represented to be (1) Defendants' signed agreements with the supermajority requirement in § 5.3 and (2) Ehrlich's draft agreement in which he marked all changes by hand and initialed those changes. Plaintiffs failed to produce these documents until the last minute, so the Court is disinclined to consider them. *See* Nov. 3, 2023, Ragues Letter to the Court; Fed. R. Civ. P. 37(c).

But that failure itself is probative. If Ehrlich had each of the Defendants' agreements all along, wouldn't he have produced them at some point in the last ten years? Not to mention, the documents are strange. For instance, PX-30 (Plaintiffs' purported copy of Reynolds's agreement) has faded, slightly slanted text for the body of the agreement. Then, on the signature page, the text is printed clearly and straightly. The signature page also appears to have a staple or fold mark in the top left corner, which doesn't appear on the rest.

The signatures present further mysteries. As mentioned, no witness could explain the variations between the signature pages in the versions produced before trial. These eleventh-hour versions have the opposite problem: their signature pages copy other versions' signature pages. PX-30's signature page matches DX-7's; PX-31's and PX-32's signature pages match PX-8's. How all of this cashes out is unclear. But these anomalies at least muddy the genuineness of any of the signature pages. So, as noted, the Court relied largely on other evidence.

As for Ehrlich's copy with handwritten and initialed changes, PX-41, it simply lacks much probative value. That copy's signature page is blank. And the only initials are Ehrlich's. Plus, even in that version, § 4.5 has already been changed to "supermajority"; only §§ 5.3 and 10.2 have

handwritten changes and initials. That combination is hard to explain under Ehrlich's version of events, in which the changes to §§ 4.5 and 5.3 were contemplated within a day of each other and both before January 28. Trial Tr. 82:22–83:9.

## CONCLUSION

Based on the above, the Court finds by a preponderance of the evidence that Defendants' version of the agreement is genuine and that Plaintiffs' version is not.

By December 5, 2023, at 5:00 p.m., each side shall each submit a letter (not to exceed two pages) proposing a schedule to finish this case.

SO ORDERED.

Dated: November 21, 2023
New York, New York

ARUN SUBRAMANIAN
United States District Judge